and we will wait for the courtroom to settle before we begin. Before we begin, I want to just note that Mr. Hill, who will be appearing for the SEC, will be appearing by Zoom. We very much appreciate Mr. Hill's consideration of the others in this courtroom and ourselves by appearing by Zoom since Mr. Hill has indicated that he is ill at the moment. So we thank you very much for making that accommodation for us. Okay, we will begin with Mr. Blum. Thank you and good morning. Mark Blum and Jody Avila on behalf of the foreign representatives. The focus of this appeal is on the three C's that are the foundation of cross-border insolvency comity, cooperation, and certainty. For the first time, a lower court has set aside these bedrock principles of cross-border insolvency law. Can I ask you a favor? Would you mind addressing jurisdiction before you get onto the merits? Surely. In whatever manner you like. The jurisdictional issue I think involves two phases. First, was the distribution order and I don't think that there's any dispute among the parties, not that we confer jurisdiction on the court, certainly, that under the torture decision within the collateral order doctrine, the order was appealable. The second issue that arises is whether the district court's grant of our motion for reconsideration in respect of an aspect of its ruling extended the time for appeal. We think that Judge Karn's recent decision in the Huffnagle case that we filed under notice of supplemental authority speaks eloquently and definitively to that issue because it says that where an issue is encompassed in the decision on the merits or inextricably intertwined with the decision on the merits, then a Rule 59 e-motion lies and the time is extended. Here, from the district court's decision and also from the colloquy, from the questioning at the hearing that appears in the transcript, it was clear that the district court viewed the entry of a stay as key and fundamental to its ruling. The entry of the stay was important to prevent the distribution of the funds during the pendency of the appeal, which would have posed two, I think, very difficult questions for the parties and the court. Had the funds been distributed, would this appeal then become equitably moot? And if not, and the appeal went forward and the district court were reversed, then would the receiver have to go back and get all the money that he had distributed to the 600 claimants? And so we see them... One reason I guess I'm a little skeptical, maybe I'm not close enough, but one reason I'm a little skeptical of this is that I just frankly remember from my days in private practice, if I was representing a losing party in the district court and I was going to take an appeal, I needed to go get a bond so that I could get a stay. And I just never considered that bound up with the merits of my argument. I was going to make some arguments on the merits, but I never considered, like, I hoped I could get the stay because there would be bad consequences if I didn't, but I never considered... I always considered those two things in different buckets. Why is that wrong? Because the district court here recognized that the entry of a stay was fundamental to its decision, that without a stay, if the money went out, there would be adverse consequences. I mean, that's always true, right? If you don't get the stay, then you may sort of effectively moot out your own case or whatever, but that just seems different from the merits of the underlying dispute to me. I think your honor's question goes to the situation where a court enters an order and a party moves for a stay, but here the district court recognized that the entry of the stay, to use Judge Karn's language and Hufnagel, was encompassed in or inextricably intertwined with the decision on the merits, and for that reason, the order included a stay that the court admitted upon our motion for a stay. Would getting a stay then always, in your view, be inextricably intertwined with the merits? Because always, if you don't get the stay, bad things are going to happen to you while your appeal is pending. You may effectively lose your appeal, but that doesn't mean that it's inextricably bound up with the merits of the underlying questions. No, your honor. In this case, it is inextricably intertwined, but by no means do we suggest that that's always... And what's different, I guess, about this appeal from every other appeal where if you don't get the stay, bad things might happen to you while your appeal is proceeding. District court recognized here that this was a case of first impression, that it was a case of great significance, and that there was a lot of money and a lot of people involved, and so therefore, from the very outset, even a month before the district court issued its decision, it looked to the fact that the money wasn't going anywhere, and it made that clear in very direct language. If I approve this distribution, the money isn't going anywhere. It was fundamental to its decision. I'm going to approve it, but I'm going to approve it with the understanding encompassed in that ruling that the money isn't going anywhere. I guess I promise I'm going to let this go, but I just don't see how that is fundamentally different from any other case. If I'm representing a district court loser, it's a $50 million judgment, and I'm going to take that $50 million judgment up on appeal, and I fail to get the stay, you know what's going to happen? The winner is going to execute on that judgment, and the $50 million is going away, right? I mean... The separation is that in that instance, the party that's seeking to perfect the appeal needs to file a separate motion for stay, which is separate from and not intertwined, not encompassed in the decision on the merits. That was Judge Karn's language in Huffnagel, that if it's encompassed in the decision on the merits, which it clearly was here, it's a different standard, and of course, here, the district court recognized that it had inadvertently miscalculated the 30-day period, which should have been a 60-day period, and so it corrected that error. We don't think that's a collateral point at all. We think it is inextricably intertwined based upon the language of the order and the text of the transcript at which the judge first previewed that if the court were to rule and approve the distribution, it would be entering a stay. Okay. Thank you. I'm sorry. Just one more question on this. Would you happen to have handy a citation to the best part of the transcript that you would rely on for this proposition? Yes, I do, Your Honor. It may take me... The reason I ask is because, as you know, the order itself says in one line, this order is stayed until September 6, 2022, to allow the filing of an interlocutory appeal. That's all that it says. Sure. The multiple references are in the transcript at pages 65, 73, and 75 through 76. And just reading the three sentences, if I might, that are directly responsive to your question, Your Honor, at page 73, the judge said the distribution is going to be held up, right? Because whatever order I enter will be stayed while an appeal is taken. So there is going to be a long period of a stay. And then at pages 75 and 76, the court went further and said, so I envision whatever order I enter allowing for a stay within it. To my reading of the word encompassed, encompassed meaning by dictionary definition included in something larger. And so giving effect to that dictionary definition of encompassed as used by Judge Carnes in the Huffnagle decision, clearly the decision to enter a stay was encompassed in the decision on the merits. If I enter an order approving the distribution, I am going to of course, if the court ruled the other way, there would not have been a stay. It was fundamental to the ruling that there had to be a stay so that the money wouldn't go out. What if the district court said, you know, based on the way this has been argued, any, any, obviously this is hypothetical. Yes. Based on the way that this case has unfolded and everything's happened, any order I issue will also include an award of attorney's fees for whichever party I decide wins. Would that be inextricably intertwined? The issue of attorney's fees? I don't think necessarily it would, Your Honor, because that's not a point that would be necessary to preserve what the court was trying to do, which was to preserve the right for appeal. That's a separate issue. Huffnagle happened to deal with an attorney's fees issue that was tied up in the order, so perhaps it would extend. And I would only, by further answer to Your Honor's question, where attorney's fees were the issue in Huffnagle and the court decided that they were encompassed in the ruling, it's much more fundamental and a much lesser step, I think, to determine that the stay here was fundamental to inextricably intertwined with and encompassed in the district court's decision. And in fact, the district court then went ahead and corrected that we had requested through the motion under Rule 59E. Thank you. To continue for the first time, a lower court here has extended its equity powers that heretofore have been reserved only for purely domestic receiverships to a situation covering an entity, a foreign entity, that is in a liquidation proceeding in its country of origin, and that proceeding has obtained recognition under Chapter 15. There are significant headwinds here to that decision that include the mandatory grant of comity under Chapter 15, Section 1509B3. One of the fundamental errors that we assigned to the district court's decision is the fact that it relegated comity to a question of access. The district court believed and stated in its decision that it had granted the foreign representatives comity when it allowed them to appear and be heard in the court. The statute allows for some wiggle room there, doesn't it? It's not just you must give comity, it's within the discretion of the court, comity shall be given. Something to that effect, right? To that effect, your honor, yes, but more precisely than that, it says as consistent with the policies of Chapter 15. Didn't the district court say that one of the policies was to give equitable distribution or to in that direction, your honor, what we believe the district court did here was take the question of law that it identified as a threshold question, the choice of law question, and decide that based upon equitable principles. That we believe also was error. It's a question, a pure question of law, what law applies, and equitable principles don't apply. In doing that, I'm sorry if I may finish. Okay, in doing that, finish your answer. Yes, in doing that, the court disregarded the plain language of Chapter 15, the philosophy. Is it okay if I ask? Of course. I just want to stop at that one point because you would push back on me, and I want to focus in on the statute that the district court did. This is 1501A3 in Chapter 15 that the interest of, and she underlined, all creditors and other interested entities, including the debtors, are part of the policies inherent within Chapter 15, right? That's correct. Right, so how is that, how is her discussion in exercising her discretion consistent with the policies not to make sure that the interests of all creditors were taken when the plan, if Kamin law applied, would essentially give it to a handful of preferred creditors? There's no suggestion that Kamin law doesn't provide for that in the circumstances of this case favored certain creditors. Within the scope of Kamin, Your Honor, is the right of every nation to establish a scheme of distribution priorities under its bankruptcy laws. For example, our Section 507 creates some priorities that other nations might find a little quirky, like for domestic support obligations and certain employee wages and benefits and consumer deposits, but the fact of the matter is, as the Fifth Circuit recognized in vitro, the fact that the foreign distribution scheme may be different from ours, that the foreign priorities may be different from ours, is not a basis to deny comedy, and here it was used as a basis to deny comedy. All right, thank you, counsel. Thank you, Your Honor. Mr. Blum? Yes, Your Honor, thank you. This is one case where I won't get, you won't say bloom because we have the kind, uh, may it please the court, Barry Blum from Venable LLP, and I have nine minutes in my remote, uh, co-appellee, Mr. Hill will have six minutes. Your Honor, quickly, on, I think, to jurisdiction, Judge Newsom, you focused on, uh, I think it is, it's a threshold issue, as Judge Karnes said, and, and I don't even think it's a close case here. A, a motion to stay is not a Rule 59e motion. The Ninth Circuit decided that exactly in the, uh, Hoggett case. But that's not exactly what we have here. I mean, I, you're right, everything you just said is correct. That's not exactly what this is. This is, as I understand, sorry, let me ask my question. Um, so I, I stated my, my general premise, and then let me ask the said, I'm staying, this, this is the distribution I'm ordering, and I am staying this to allow for an interlocutory appeal of my order. And the request was to extend that period of time because to actually affect what the district court wanted, which was to cover the period of interlocutory appeal plus a few days to allow, uh, the, the good folks at the Eleventh Circuit to then decide on this thing. Um, so that seems to be different than just a motion to stay being treated as a by the way, the, the, you are right that the stay was a sua sponte stay. It wasn't even sought. So it wasn't tied up into the merits. It wasn't briefed by the parties. It was brought up through as a practical matter. And frankly, from the receiver's point of view, the receiver understands it's not going to distribute money that it may not be able to get back. But the, the way that that gets affected is to file a Rule 8 motion and to say, look, there's, if this money goes out, we're never going to get it back. In fact, right, we agreed to the extension of that stay, but it, that does not make this stay, um, uh, something that is encompassed in a decision on the merits of the dispute and not collateral to the merits, which is the Elementa and Lucas standard. So your, your opposing counsel pushes back on that and says, that's certainly true in the, in the abstract, but here it was because of the nature of what this is and the nature of what this is, is it, once the distribution plan is done, once the to unwind. And so you have to stay it to get review on this, which is the whole point of why it's a collateral order. I mean, even that is very rare that you get interlocutory appeal on something like that. So the whole nature of this requires a stay. I think that's his argument. Correct. Which is a factors weighing in the granting of a stay under Rule 8 and other rules, but it does not make the stay integral to the merits that if, if Judge Altanaga did not put that sentence in, you have the same order appealable as a, uh, under the Tortia case and we, we go on and they come in, they can file a motion to stay. It has zero to do. No one suggests that, uh, uh, if, uh, Judge Altanaga ever said, well, I'm not going, you know, I can't grant this stay possibly unless I can't grant this relief unless I stay the order she's saying as a practical matter, she is going to, she's going to grant the stay. In fact, she raised it sua sponte. But again, the tests in this court, right on jurisdiction is a, uh, did their September one motion, which was labeled as a Rule 59 motion, did it ask the court to substantive, substantively reconsider its original judgment, its original order and judgment. That's the reconsideration of substantive issues resolved in the judgment. A motion to stay is not a substantive issue relating to the approval of a receivership order, the application of comity or any of those things. It was a sua sponte, a, a, a motion to stay and you're right in the Hoggett case, it was to stay the judgment pending a, a, a pending appellate decision that they thought might have an effect on the case. But the court said, uh, asking for a stay is not something that goes to the merits of the case that asked the court to reconsider its original judgment. It is a motion to stay that judgment, a motion to stay a judgment or even an order staying it, uh, or for them to ask to extend the state actually accepts the judgment as entered. We don't like it, we're going to appeal it, but it does not in any way challenge, they do not use in their motion, the word error, erred, erroneous, a mistake, correct. Rule for you, should we say that a stay request or an extension of a stay request can never, ever fall within 59E? Never, ever are funny words, but I, I don't believe that I've seen any case ever that would allow that. I mean, think about it. If you talk about the Huffnagel case, because, and the reason I ask is because in the attorney's fees context, and we talked about this, we've said no, but we've also said yes, that it matters on the context. Well, it, it, you, the court in Huffnagel said yes, only because as we point out in our response, the attorney's fee, uh, condition of dismissal was the only thing really decided there. The parties did not fight about whether a case should be voluntary. I guess my point is simply that was inextricably intertwined. What matters is what happened below. In other words, it can't just be a rule. We couldn't write a rule that said attorney's fees are always collateral and can never be the subject of a 59E motion, right? Well, right. But they, as long as they meet the, uh, the Osterneck and the, um, uh, Lucas and, and, and the Alimenta test, which, which, uh, uh, Judge Karnes and Huffnagel said those cases, and he also relied on the Buchanan case from the Supreme Court and said, they're distinguishable because, uh, in this case, the attorney's fees was the, really the merits of the decision, whether to condition it on immediate payment or only upon a refiling. So the decision in the Huffnagel case was whether attorney's fees should be awarded now or only on refiling. There were no other merits of the case, right? And, and that's the single story here. The, uh, as, as, as Judge Newsome, I mean, it could be a case where the court says, um, uh, you know, I'm going to, I order a hundred million dollar judgment. And if the plaintiff can't, uh, the defendant can't bond it off, terrible things are going to happen. And, uh, the court may, the court could entertain a motion and say, well, I won't make you post the whole hundred million, but that has nothing to do with the underlying judgment. And in fact, it goes up right after the appeal as a judge, uh, uh, uh, uh, uh, under the inextricably intertwined cases, it goes up in the court. Um, the lower courts divested of jurisdiction over everything related to the merits, but a stay motion has to be filed in the district court. I mean, that rule eight kind of suggests that a stay has nothing to do with the merits that are up on appeal or else you'd have to file the stay up only in the, in the circuit court. I want to get quickly to the, um, uh, the statutory construction here, an important point 50, uh, the, the statute that they rely on 1509, uh, B3, they argue for the notion of mandatory comedy, which we believe in the applicant. When you're talking about the application of foreign law in a U S district court is really an oxymoron, right? Comedy is a discretionary matter. And it has been for a long time. Can I ask you a quick question? Sure. The parties both really seem sort of fixated on comedy, but, but B3 says comedy or cooperation. Correct. Why isn't then, why aren't we just talking about cooperation? Well, well, we really are. And because you're on a, this motion of mandatory comedy was not raised below there. It's, it's raised for the first time on this appeal. They never argued that 1509 B3 required judge Altenau to apply came in law. They said, well, that, that language kind of leans in our favor on a traditional comedy out analysis, but on a P and I, we, we've made an argument that the argument should be forfeit and has been waived. However, that statute 1509 three is part, uh, 1509 itself is titled right to direct access has nothing to do with any relief or remedy. And it, it has an unusual phrase really that a court, and it actually applies to judge Altenau as in the receivership court shall grant comedy or cooperation to the, the foreign representative, excuse me, to the representative, right? Not to not, it doesn't say shall apply whatever law they say. And the Cozumel case and other cases have specifically said that that applies and they do huge analyses of chapter 15 that apply 1509 B3 relates to access to the courts. Once recognition is granted to the foreign representative, any U S court state or federal other than the chapter 15 court must allow that person to appear and be heard. And the Cozumel case says, um, uh, on that point and it's a judge Glenn, uh, chief bankruptcy judge Glenn, a very, a very well reasoned decision says that granting comedy under, uh, to the foreign representative, and that's highlighted in the judge's opinion to the foreign representative is very, very much different than, um, uh, than granting the request to apply foreign law as a matter of comedy, which deals with the relief or, uh, that the, uh, uh, the foreign representative seeks. It's one thing for comedy to the foreign representative means this person, once they've recognized by the chapter 15 court is allowed to appear. And if they go to a state court in, in, in, uh, Pennsylvania, that court can't go behind their authority to appear in behalf in the U S courts and to assert their position as, uh, you know, in this case, the JOL in, in, uh, I see my time is up. All right. Thank you very much, Mr. Blum and Mr. Hill. You have six minutes. Thank you, your honor. Um, Ezekiel Hill for the securities and exchange commission, may it please the court. And let me begin by thanking the court for permitting me to appear remotely and for that of course, staff for facilitating my parents. I'd like to begin if I met with, um, the, the, the merits of the, uh, upon its position here. And there, it is purely a question of statutory construction as they have limited their arguments in the reply brief. And it's as to the meaning of section 1509 B3, their argument as discussed is that it men's application of foreign law, uh, by, by a court and here by, by the district court, as you heard from Mr. Blum a minute ago, the text is inconsistent with that interpretation. Again, it's comedy or cooperation to the foreign representative, not comedy full stop. And it's critical here that the context provides some meaning for the, for the interpretation of comedy, uh, comedy as a concept. And this is clear in all of the, the comedy, uh, common law cases cited by the appellants. Comedy is never a must. It's always a doctrine of consideration. It's never a requirement, uh, for the application of foreign law. And that is why to the foreign representative provides critical context for understanding comedy and the, in this statutory provision, it's also important to look to the source of the statutory provision. Uh, section 1501 a says the purpose of this chapter is to incorporate the model law. And that's the model law on cross-border insolvency formulated by, uh, the United Nations commission on international trade and 1509 implements the purpose of article nine of the model law. That's what Congress recognized here in promulgating chapter 15. That's what the fifth circuit recognized in vitro and the fourth circuit recognized in Jaffe. And if you then look to article nine of the model law, it's titled right of direct access, and it provides a right of access, not a right of relief in full article nine reads a foreign representative is entitled to apply directly to a court in this state. And I urge the court to look to the model law guidance, which was promulgated with the model law in which again, the fifth circuit and fourth circuit, uh, have looked to in interpreting article nine, the model law guidance for article nine says article nine is limited to expressing the principle of direct access. In other words, there's no substantive right of relief in chapter 1509 B3. That also has to be the correct interpretation based, not just the text, uh, source of the text, but also the context chapter 15 creates a process by which a foreign representative can secure recognition of a foreign proceeding and recognition of the foreign representative in the United States court under chapter 15, access to the court recognition rather is not the same as substantive relief. And chapter 15 sets out specific provisions that permit for substantive relief to the foreign in particular that's, uh, section 1507 and section 1521. And the appellants have been very clear here, particularly on page 12 of their reply brief. They have not asked the district court here for relief under chapter under section 1507 or section 1521. Their argument is purely that based on 1509 B3, which provides comedy or cooperation to the foreign representative, they're entitled to mandatory application of foreign law. Were that the case, it would entirely overlook and override that chapter 15 provided for substantive relief in separate sections, specifically section 1507 and 1521. Aside from the text, the source of the text in the context, the consideration by courts of chapter 15 are also demonstrate that the, the appellant's reading of the policy have not identified any instance of a court interpreting 1509 B3 is providing relief. And the key cases they rely on, in fact, demonstrate the opposite. So for example, if you consider the fifth circuit's decision in vitro, I granted admission to the foreign representative in the foreign proceeding under chapter 15. It did not then, however, determine that they were entitled to mandatory application of foreign law and Mexican law. Instead, they looked to the foreign representative's request for relief under section 1507 or 1521 and consider relief under those provisions. That is the correct process to follow under chapter 15, and it is not the process that the appellants have followed here. In fact, they have specifically stated in the reply that they, that is not the process they follow. They're not seeking under those provisions. I'd also like to then turn to the appellant's argument in, in their briefing and also in their notice of request for judicial notice as to the impact of this case. The issue on appeal, again, is quite a narrow one in light of the appellant's report brief. It's simply whether section 1509 B3 mandates application of foreign law. But again, that's not the mechanism by which other foreign representatives have sought substantive relief in the U.S. court. And to reject the appellant's reading of 1509 B3 is simply closing a path that is unused by other foreign representatives to say nothing of the fact that it's not a path that leads to substantive relief. It's actually an embrace of appellant's reading of section 1509 B3 that would be a highly significant result. It would divest U.S. courts of nearly all discretion as to whether foreign law should apply upon recognition of a foreign proceeding. And it would reflect a view of comedy that is incompatible with that of the Supreme Court and of this court. And I see that my time has expired, so I will stop there unless the court has any questions. Thank you, Mr. Hill. We hope you feel better soon. And that brings us back to Mr. Bloom. Mr. Bloom, you've reserved five minutes. Yes. Let me begin, if I may, by addressing Judge Newsom's point about the use of the words comedy or cooperation in 1509 B3. The Fifth Circuit spoke to that in vitro, which cooperation means more than comedy. And cooperation, in fact, is mandated under section 1525 of the Bankruptcy Code, which talks about cooperation between U.S. courts and fiduciaries on the one hand and foreign courts and fiduciaries on the other. And it similarly is mandated. It's not just one of the policies that is a bedrock, but that's why we cite it as one of the three Cs. Your opposing counsel says that what the statute really means is that it's comedy and cooperation to foreign representatives when they come in, but not that foreign law comes and gets dumped into the American proceeding. I'm glad that the court made that distinction because that reading seems to ignore what the definition of comedy is. Since Hilton v. Guillot, the definition of comedy has been respect for and recognition of the legislative and judicial processes of a foreign nation. Here, the foreign nation is the Cayman Islands, the legislative process being the adoption of the Companies Act. It includes a distribution scheme and covers the feeder fund limited. The judicial process is the admission of that company into liquidation and the appointment of the joint official liquidators who serve as foreign representatives. The grant of comedy then requires more than mere access. The grant of comedy was discussed when it was a discretionary principle back in the Gebhardt days. Do you think B3 requires the court, the United States court, to grant comedy? Yes, Your Honor. How? Because it says a court in the United States shall grant comedy or cooperation to the foreign representative. I don't understand how that is a command to provide comedy. It's a command to provide one of two things, either comedy or cooperation to the foreign representative. I'm looking for the citation, but the Fifth Circuit noted in vitro that cooperation involves more than mere comedy. That comedy under 1509 B3 is elevated to a fundamental principle and really because of that mandatory language is no longer discretionary as it was back in the days when the Supreme Court decided Gebhardt. But the principle, two of the principles on which Gebhardt was decided are directly relevant today. The first is that every investor, be that investor domestic or foreign, conclusively is presumed to have voluntarily submitted to the laws of a foreign nation, including the laws governing that creditor's rights in an insolvency proceeding in that nation if the investor chooses to invest in a foreign company. And that's coupled with the admonition that if the investor doesn't like those laws, then the investor should invest its money somewhere else. The second prong of Gebhardt that we think is critical here is that the court recognized in Gebhardt that the Canada scheme that US investors work, I'm so unhappy about that they didn't discriminate between investors on the basis of nationality. All it did was adopt a different priority scheme and as the court in vitro noted and as the court in Justice Sotomayor back when sitting as a judge on the second circuit noted in Telecom Argentinas, the priority scheme is not a basis to deny comedy. The fact that an investor may recover more under US law than it would recover under foreign law is not a basis to deny comedy. Again, we have our priority scheme, Cayman Islands has theirs, and the district court erred, we believe, when it chose to ignore the priority scheme established in the Cayman Islands. Compounding that error, the district court then issued its decision based upon what would be most advantageous to US investors. The district court's decision says that if I apply Cayman law, then foreign investors will take all the money to the detriment of US investors. That principle of discrimination is exactly discrimination on the basis of nationality. Overt discrimination in the face of federal law is wrong. It was improper. Why? Because Gebhardt said so. One of the reasons you uphold foreign law is where it does not discriminate and also because under our section 1513 of chapter 15, we say that the fact that a creditor may be a foreign creditor does not deprive that creditor of any entitlement to a priority under our section 507. The priorities that we establish, we're telling the world, and the other 60 nations that have adopted the model law are also telling the world. Our priority scheme is going to provide for the same treatment for you as a foreign creditor than it does for a US creditor. I see that my time is up. Thank you, counsel. Thank you.